# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF CORAL SPRINGS POLICE OFFICERS' PENSION PLAN, derivatively on behalf of BLOCK, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0091-KSJM |
| JACK DORSEY, ROELOF BOTHA, AMY BROOKS, PAUL DEIGHTON, RANDY GARUTTI, JIM MCKELVEY, MARY MEEKER, ANNA PATTERSON, LAWRENCE SUMMERS, DAVID VINIAR, and DARREN WALKER, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| BLOCK, INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 10, 2023
Date Decided: May 9, 2023

Thomas Curry, Tayler D. Bolton, SAXENA WHITE P.A., Wilmington, Delaware; David Wales, Sara DiLeo, SAXENA WHITE P.A., White Plains, New York; Adam Warden, Jonathan Lamet, SAXENA WHITE P.A., Boca Raton, Florida; *Counsel for Plaintiff City of Coral Springs Police Officers' Pension Plan*.

Raymond J. DiCamillo, Kevin M. Gallagher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Colin B. Davis, Katie Beaudin, GIBSON DUNN & CRUTCHER LLP, Irvine, California; Brian M. Lutz, GIBSON DUNN & CRUTCHER LLP, San Francisco, California; Lissa M. Percopo, GIBSON DUNN & CRUTCHER LLP, Washington, D.C.; *Counsel for Defendants Jack Dorsey, Roelof Botha, Amy Brooks, Paul Deighton, Randy Garutti, Jim McKelvey, Mary Meeker, Anna Patterson, Lawrence Summers, David Viniar, and Darren Walker, and Nominal Defendant Block, Inc*.

**McCORMICK, C.**

The plaintiff, a stockholder of Block, Inc., filed this derivative suit challenging Block's acquisition of TIDAL—a music streaming company associated with rapper, producer, and entrepreneur Shawn Carter. Block facilitates payment processing and helps individuals transfer money electronically; it had never ventured into the music streaming industry and, at the time it acquired TIDAL, had no plans to do so. The idea for the acquisition came to Jack Dorsey—Block's founder, CEO, and Chairman—when he was summering with Carter in the Hamptons. From his Hamptons retreat, Dorsey joined a videoconference meeting of Block's board and proposed that Block acquire TIDAL. The board formed a transaction committee to consider the proposal.

Over the ensuing months, the committee learned that TIDAL was failing financially, losing its major contracts, and facing an ongoing criminal investigation. The committee also learned that Carter personally loaned TIDAL $50 million to help the troubled company through its difficulties and that Dorsey was the sole Block management member in support of the acquisition. Despite the obvious problems with the deal, the committee approved the transaction for $306 million. It seemed, by all accounts, a terrible business decision.

Under Delaware law, however, a board comprised of a majority of disinterested and independent directors is free to make a terrible business decision without any meaningful threat of liability, so long as the directors approve the action in good faith.

The defendants moved to dismiss the complaint for failure to plead demand futility. That motion hinges on whether the plaintiff adequately alleges that the committee members would face a substantial likelihood of liability for approving the transaction. The plaintiff did not meet that pleading burden. The case is dismissed.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint")[1] and documents it incorporates by reference, including meeting minutes and associated materials that were referenced or quoted in the Complaint.

### A. Block And Its Board

Block, a California-based company, offers products and services that help businesses facilitate payment processing and help individuals transfer money electronically. Block's net income in 2019 and 2020 was $375.4 million and $213.1 million, respectively.

Dorsey founded Block and took the Company public in 2015. He is Block's President and CEO, and he serves as Chairman of Block's Board of Directors (the "Board"). According to Block's public filings, Dorsey held between 48.08% and 51.32% of the Company's total stockholder voting power at relevant times.

At the time of the acquisition, the Board comprised eleven members: Dorsey and Defendants Roelof Botha, Amy Brooks, Paul Deighton, Randy Garutti, Jim McKelvey, Mary Meeker, Anna Patterson, Lawrence Summers, David Viniar, and Darren Walker (collectively, "Defendants").

### B. Carter's Acquisition And Attempted Revamp Of TIDAL

Carter, known professionally as "Jay-Z," is a rapper, record producer, and entrepreneur. In 2015, a group of recording artists led by Carter acquired a Norwegian

---

[1] C.A. No. 2022-0091-KSJM, Docket ("Dkt.") 1 ("Compl.").

2

music streaming company, formerly called Aspiro, for $56 million and rebranded it as TIDAL. Carter spearheaded these efforts and served as the public face of TIDAL. He also held a 27% stake in the company. Along with his partners, Carter launched a campaign for TIDAL to break into the music streaming industry as an artist-friendly platform.

The campaign was unsuccessful. By mid-2020, TIDAL had amassed only 2.1 million paying subscribers, which compared poorly to competitors like Spotify (138 million paying subscribers), Apple Music (60 million), and Amazon Music (55 million). TIDAL had logged multimillion-dollar losses for each of the preceding ten quarters. Carter personally extended a $50 million loan to TIDAL in 2020.

TIDAL's operations also showed signs of distress. Between 2015 and 2020, TIDAL had churned through five different CEOs. The Company's contracts with music labels were semi-formal at best; some had expired. TIDAL had incurred substantial unpaid liabilities to music labels for streaming fees. In a public fallout, TIDAL lost its exclusive streaming arrangement with recording artist Kanye West. To top it all off, the Company was facing an ongoing criminal investigation in Norway for artificially inflating its streaming numbers.

### C. Dorsey Proposes That Block Acquire TIDAL.

Dorsey and Carter are friends. They share interests in cryptocurrency and philanthropy. Dorsey publicly supported Carter's acquisition of TIDAL in 2015, tweeting, "I appreciate & respect people who depart from their strengths and take on new challenges.

3

Been using Tidal & digging it!"[2] In April 2020, they jointly issued grants for COVID-19 relief totaling $6.2 million. Dorsey donated $10 million to Carter's nonprofit, Reform Alliance, in May 2020.

While their families were summering together in the Hamptons, Dorsey and Carter began discussing a potential acquisition of TIDAL by Block. On August 25, 2020, Dorsey joined the Board's regularly scheduled meeting by videoconference from the Hamptons. During the meeting, Dorsey raised the idea that Block acquire TIDAL. The meeting minutes reflect the Board's discussion of strategic rationales, proposed valuations, and the Company's potential integration strategies. The Board then "instructed management to continue to evaluate such transactions including through additional due diligence and negotiation of a letter of intent."[3] The Board resolved to establish a transaction committee to review any potential acquisition of TIDAL by unanimous written consent (the "Transaction Committee").

The proposed Transaction Committee members were four independent directors: Botha, Brooks, Meeker, and Walker (the "Committee Defendants"). The resolution authorized the Transaction Committee to retain advisers to evaluate a potential acquisition and granted it the authority to approve a purchase. All directors excluding Dorsey signed their written consents on August 26, 2020. Two days later, on August 28, Dorsey executed his written consent, and the Transaction Committee was officially formed.

---

[2] Compl. ¶ 107.

[3] Dkt. 7 ("Smith Aff."), Ex. 2 (Aug. 25, 2020 Board Minutes) at SQ220_000002.

Meanwhile, Dorsey drafted and submitted a non-binding letter of intent for Block to purchase TIDAL for $554.8 million.

## D.     The Transaction Committee's First Meeting

The Transaction Committee convened by videoconference for its first meeting on September 29, 2020.  The meeting lasted 35 minutes.  Dorsey and members of Block's legal team attended the meeting and were present for its duration.  The Transaction Committee discussed TIDAL's competitive landscape and Block's proposed product development strategies.  Dorsey then "provided his perspective on the transaction as well as the interim management strategy should the transaction move forward."[4]

In advance of its first meeting, the Transaction Committee received three reports from Block management analyzing a potential acquisition of TIDAL.  The reports included general background on the music industry, an outline of Block's strategic goals in entering the industry, and a preliminary analysis of the investments Block would need to make into TIDAL to make it successful.  None of the three reports contained management's valuation of the proposed acquisition.  The third report, delivered the day before the Transaction Committee's first meeting, was the first time that management informed the Transaction Committee that Dorsey and his team had submitted a letter of intent a month earlier.

## E.     The Transaction Committee's Second Meeting

Block management provided the Transaction Committee with its fourth written report on October 14, 2020.  Management reported that TIDAL had only amassed 2.1

---

[4] Smith Aff., Ex. 9 (Sept. 29, 2020 Transaction Committee Minutes) at SQ220_000011.

million paying subscribers and that growing this number would prove difficult. Management reasoned that "Spotify is synonymous with music streaming," and Apple Music and Amazon Music had largely captured the remaining market share.[5] The report also apprised the board that TIDAL had generated negative EBITDA of $39 million in 2019 and of Carter's $50 million loan to the company.

Management further revealed that TIDAL operated under semi-formal or expired arrangements with these labels, capitalizing on the influence of the prominent artists who were partial owners of TIDAL. The report warned that TIDAL's relationships with these labels could sour following an acquisition by Block.

The report highlighted other potential risks in an acquisition, such as the ongoing criminal probe by the Norwegian government and a federal lawsuit brought by artists alleging that TIDAL had withheld their owed royalties. TIDAL's relationships with its artists were also faltering, and rapper Kanye West had withdrawn from his exclusive streaming arrangement with TIDAL for one of his albums due to piracy issues.

Management set an "[e]xpected purchase price" of $550–750 million.[6] They reached this conclusion based on: comparables analyses with Spotify, Apple Music, and Amazon Music; comparables analyses with private precedent transactions; discounted cash flows analysis derived from TIDAL's management forecasts; and TIDAL's representations

---

[5] Smith Aff., Ex. 10 (Oct. 14, 2020 Report).

[6] *Id.* at SQ220_000125.

that it was in discussions with an undisclosed third party for a loan that valued TIDAL at $500–600 million.

The Transaction Committee convened for its second meeting on October 20, 2020. Dorsey and his management team presented on the October 14 report and additional financial information from TIDAL. Among other things, management informed the Transaction Committee that TIDAL had recorded multimillion-dollar losses in each of its previous ten quarters. These losses, management reported, would dilute Block's earnings for at least three years and potentially create volatility in its stock price. Management's presentation acknowledged that TIDAL's existing contracts with its artists had expired, yet management valued TIDAL's "intangible" artist relationships at $231 million.[7] Management also presented on TIDAL's accrued liabilities of $127 million, primarily from amounts owed to record labels for streaming fees.

In a section called "Committee Q&A," the presentation addressed 18 multi-part, complex questions from Transaction Committee members, and the answers to these questions spanned 14 single-spaced slides in the presentation. One member asked, "Who are internal advocates for transactions? Is there sufficient buy in?"[8] The slide reported that Dorsey was still "the primary sponsor of the deal" and that he was "the only one who is strongly advocating to move forward."[9] The slide also stated that there was "substantial

_____

[7] Dkt. 7 ("Smith Aff."), Ex. 11 (Oct. 20, 2020 Presentation) at SQ220_000165.
[8] *Id*. at SQ220_000179.
[9] *Id*.

7

push back from Core members," *i.e.*, Block's senior executives, and that neither of Block's two business unit leaders, Alyssa Henry and Brian Grassadonia, were advocating for the transaction.[10]

Another Transaction Committee member asked whether TIDAL artists had any legal commitment to maintain their relationship with the platform following a merger. The presentation stated that "existing artists will have no legal obligation to [Block]; we are counting on their economic incentives as owners to drive future contributions to the growth and success of [TIDAL]."[11] In response to a follow-up question requesting a "Drilldown" on the specifics of artists' commitment, the presentation again acknowledged that the agreements "may be difficult to enforce legally, we will largely be relying on Jay-Z's influence with them" to secure performance.[12] When asked about the value of these artist relationships, management responded that "we do not have a concrete view on the value of the artist shareholders."[13]

One Transaction Committee member asked for the one-month, six-month, and one-to-three-year plans for assimilating and building the business. The response admitted that "[w]e do not have this level of detail at this stage" and acknowledged that "the lack of a clear operational/strategic lead here remains one of the greatest risks."[14] In the "Investor

---

[10] *Id.*

[11] *Id.* at SQ220_000172 (underline in original).

[12] *Id.* at SQ220_000173.

[13] *Id.* at SQ220_000183.

[14] *Id.* at SQ220_000174.

Relations Plan" section, the presentation described the framing to investors as follows: "While it is a big opportunity, the bet we are taking today is small relative to the size of Square."[15]

Despite these concerns, management informed the Transaction Committee that they intended to enter a deal term sheet in which Block would acquire approximately 90% of TIDAL at an enterprise valuation of $490 million. Certain member artists would retain the remaining 10% stake.

The October 20 meeting lasted an hour, and Dorsey was present for the entirety of the meeting. In closing, the Transaction Committee "instructed management to continue pursuing the transaction and update the Committee as negotiations progress."[16]

The Transaction Committee updated the full Board at its regularly scheduled meeting the next day, October 21. According to the Board minutes, Transaction Committee member Brooks provided an update on "the work that the deal team has undertaken and the discussions that the Transaction Committee of the Board have had in connection with the review of the target and the negotiation of a potential term sheet."[17] The Transaction Committee's update was one of 14 items of business discussed at the October 21 Board meeting.

---

[15] *Id*. at SQ220_000180.

[16] Smith Aff., Ex. 12 (Oct. 20, 2020 Transaction Committee Minutes) at SQ220_000023.

[17] Smith Aff., Ex. 13 (Oct. 21, 2020 Board Minutes).

**F.      Block And TIDAL Agree On A Term Sheet.**

On November 10, 2020, Block entered a term sheet to purchase a majority interest in TIDAL. A few days later, Dorsey and Carter were spotted vacationing together in Hawaii.

The Transaction Committee did not convene again until January 22, 2021. The meeting lasted an hour, according to the minutes. Dorsey and his team presented to the Transaction Committee members on the proposed transaction. Based on TIDAL's failure to meet its management's forecasts for 2020, and the likely scenario that T-Mobile would soon pull out of a significant partnership with TIDAL, Block's management reduced its valuation of TIDAL to $350 million.

Block's management estimated that TIDAL would generate its own negative EBITDA of $15.8 million in 2021, $24.5 million in 2022, and $32.4 million in 2023. Based on management's projected capital infusions that Block would need to make into its TIDAL investment, they predicted the acquisition would generate negative EBITDA for Block of $35.6 million in 2021, $55 million in 2022, and $68.3 million in 2023.

Management downplayed the bad news as minor within the greater scheme of Block's financial success. In another Committee Q&A in the January 22 presentation, the Committee members posed at least ten new questions and reviewed answers spanning eight slides.[18] The Committee asked about the 8% to 10% drag on EBITDA. Management

---

[18] Questions and responses in the "Legal Questions" Q&A category were redacted on the basis of attorney-client privilege.

assuaged the Committee that the TIDAL acquisition "doesn't move the needle on our gross profit growth rate given [TIDAL's] relative magnitude."[19] Management also responded to questions about the acquisition's scale, noting that a $350 million purchase price would only constitute 0.35% of Block's $100 billion market capitalization.

Like in the October 20 meeting, the Transaction Committee pressed management for more details on artists' legal obligations to continue working with TIDAL post-acquisition. Management responded that "whether an artist contributes to the platform or not, there would be no recourse for [Block] to take."[20] When pressed on the basis for "how we will win" in the market, the presentation stated plainly that the "[m]ost important driver here will be Jack's and Jay's vision."[21]

Ultimately, Dorsey proposed a purchase price of $309 million to acquire an 88% stake in TIDAL, implying a $350 million total enterprise valuation. Carter would retain an 8% stake, and other artist partners would hold the remaining 4% interest. The presentation set forth the acquisition as more of an assumption than an open question: "We will update the Committee once we have finalized terms we are comfortable with, and unless there are additional remaining questions, we can circulate a UWC to the Committee to approve the transaction."[22]

---

[19] Smith Aff., Ex. 14 (Jan. 22, 2021 Presentation) at SQ220_000237.

[20] *Id*. at SQ220_000242.

[21] *Id*. at SQ220_000243.

[22] *Id*. at SQ220_000200.

11

The Transaction Committee concluded that management should continue pursuing the transaction and update it as negotiations progressed. The Transaction Committee provided the full Board with an update on the proposed transaction at its regularly scheduled meeting on February 11.

**G.     The Transaction Committee Approves The Acquisition.**

Without any further meetings, the Transaction Committee approved the acquisition by unanimous written consent on February 25, 2021. The Company announced the deal on March 4, after which its stock price decreased by 7%. In an 8-K filed two days later, the Company reported that it would pay consideration of approximately $306 million, subject to adjustments, for an ownership stake of approximately 87.5%.

Block closed the deal on April 30, 2021. In its 10-Q filed on November 4, 2021, Block disclosed that, after adjustments, it ultimately paid $237.3 million for an ownership interest of 86.23%. For accounting purposes, Block characterized $198 million of the purchase price as "Goodwill." After the transaction closed, Carter joined the Board as a twelfth member.

Also in February 2021, Dorsey and Carter continued to partner in their personal lives, creating an endowment to fund bitcoin development in India and Africa. Their joint contributions to this endowment totaled $23.6 million.

**H.     This Litigation**

Plaintiff City of Coral Springs Police Officers' Pension Plan ("Plaintiff") is a beneficial owner of Block common stock. Before filing this action, Plaintiff made a

12

demand for books and records pursuant to 8 *Del. C.* § 220, and Block produced documents in response.

Plaintiff filed this derivative action on January 27, 2022. The Complaint asserts two causes of action challenging the TIDAL acquisition as a breach of fiduciary duty—Count I against Dorsey as a controller and Count II against the directors on the Board at the time the transaction was approved.[23] Defendants moved to dismiss the Complaint. The motion was fully briefed, and the court heard oral argument on January 10, 2023.[24]

## II.    LEGAL ANALYSIS

Defendants moved to dismiss the Amended Complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6). Because the Rule 23.1 motion results in dismissal, the court does not reach the Rule 12(b)(6) motion.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[25] "In a derivative suit, a stockholder

---

[23] *See* Compl. ¶¶ 112–121.

[24] *See* Dkt. 6 (Defs.' Opening Br.); Dkt. 13 (Pl.'s Answering Br.); Dkt. 19 (Defs.' Reply Br.); Dkt. 32 (Oral Arg. Tr.).

[25] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and

13

seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[26]  Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[27]  The demand requirement is a substantive principle under Delaware law.[28]  Rule 23.1 is the "procedural embodiment of this substantive principle."[29]

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[30]  Stockholders choosing to allege demand futility must meet the "heightened pleading requirements,"[31] alleging "particularized factual statements that are

plenary.  746 A.2d at 253–54.  The seven partially overruled precedents otherwise remain good law.  This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[26] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (2021).

[27] *Id.*

[28] *Id.*; *see* Ct. Ch. R. 23.1(a).

[29] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[30] Ct. Ch. R. 23.1(a).

[31] *Zuckerberg*, 250 A.3d at 876.

essential to the claim."[32]  "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[33]

In *Zuckerberg*, the Delaware Supreme Court affirmed and thereby adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[34] and *Rales*.[35]  When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[36]

---

[32] *Brehm*, 746 A.2d at 254.

[33] *Id.* at 255.

[34] 473 A.2d 805 (Del. 1984).

[35] 634 A.2d 927 (Del. 1993).

[36] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (quoting *Zuckerberg*, 250 A.3d at 890).

15

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[37]  While the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[38]

As of the date when Plaintiff filed their complaint, the Board comprised twelve directors: Dorsey, Carter, the Committee Defendants, and the remaining six Defendants (Deighton, Garutti, McKelvey, Patterson, Summers, and Viniar).  To defeat Defendants' Rule 23.1 motion, Plaintiff must impugn the impartiality of at least six directors under *Zuckerberg*.

Generally, demand futility is assessed on a claim-by-claim, or Count-by-Count, basis.[39]  In this case, however, the two Counts are based on the same factual predicate— the Board's approval of the TIDAL acquisition.  The sole distinction is in named defendants—Dorsey in Count I and the rest of the Board who approved the transaction in Count II.  Because the difference in defendants does not alter the outcome, this decision consolidates the analysis of the two Counts.[40]

---

[37] *Id.* at 1041 ("The Court of Chancery's refined articulation of the *Aronson* standard helps to address these issues.  Nonetheless, this refined standard is consisted with *Aronson*, *Rales*, and their progeny.  Thus, cases properly applying those holdings remain good law.").

[38] *Id.*

[39] *Sandys v. Pincus*, 2016 WL 769999, at *6 (Del. Ch. Feb. 29, 2016), *rev'd on other grounds*, 152 A.3d 124 (Del. 2016).

[40] *See In re CBS Corp. S'holder Class Action and Deriv. Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021) ("[W]here a member of the demand board's interest extends beyond derivative claims asserted against him to claims asserted against his co-defendants,

16

Plaintiff focuses its arguments on Carter, Dorsey, and the four Committee Defendants. Plaintiff argues that: Carter is disqualified because he received a material personal benefit from the TIDAL acquisition; Dorsey's relationship with Carter made him incapable of impartially considering a demand concerning the TIDAL acquisition; and the Committee Defendants face a substantial likelihood of liability from claims challenging the TIDAL acquisition.

The analysis as to Carter and Dorsey goes Plaintiff's way. Defendants concede that Carter is interested in the transaction. And there are good arguments that Dorsey lacks independence from Carter for the purpose of the TIDAL acquisition. When supported by specific factual allegations, "professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand."[41] "[T]he heightened strength of relationship required to" raise a reasonable doubt as to a director's independence "renders allegations concerning most ordinary relationships of limited value, at most."[42] Two recent Delaware Supreme Court decisions addressing the independence analysis under Rule 23.1 urge the court to

---

he is deemed unfit to consider a demand to pursue those claims as well."); *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at \*17–18 (Del. Ch. Apr. 27, 2020) (demand excused as to claims against officers even though demand board did not face liability); *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at \*26 (Del. Ch. Aug. 24, 2020) (same).

[41] *Beam*, 845 A.2d at 1050 (citation omitted).

[42] *Khanna v. McMinn*, 2006 WL 1388744, at \*16 (Del. Ch. May 9, 2006).

evaluate personal relationships in a commonsense manner.[43]  Applying this commonsense approach to Dorsey and Carter's relationship, Plaintiff has the better side of the argument. It is reasonably conceivable that Dorsey used corporate coffers to bolster his relationship with Carter.  But the court need not delve too deeply into this issue, because Plaintiff has failed to meet its burden as to the remaining ten directors.

Plaintiff argues that demand is futile as to the Committee Defendants because they face a substantial likelihood of liability from the subject matter of the litigation demand. Where, as here, the corporation's certificate of incorporation exculpates its directors from liability to the fullest extent permitted by law, the substantial-likelihood standard requires that a plaintiff "plead particularized facts providing a reason to believe that the individual director was self-interested, beholden to an interested party, or acted in bad faith."[44]  A

---

[43] *See Sandys v. Pincus*, 152 A.3d 124 (Del. 2016) (reversing the trial court's determination that plaintiff had failed to adequately allege that a director lacked independence from a CEO with whom the director co-owned a private jet, holding that the co-ownership is "suggestive of the type of very close personal relationship that, like family ties, one would expect to heavily influence a human's ability to exercise impartial judgment"); *Marchand v. Barnhill*, 212 A.3d 805, 818–20 (Del. 2019) (reversing the trial court's determination that the plaintiff had failed to adequately allege that a director lacked independence from the controller and Kruse family where the director started as the Kruse patriarch's administrative assistant and, over the course of a 28-year career with the company, rose to the high managerial position of CFO, became a director due to the support of the Kruse family, and was the honorary beneficiary of the Kruse family's charitable efforts that led to a $450,000 donation to a key local college, observing that "our law has recognized that deep and longstanding friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other").

[44] *Zuckerberg*, 2020 WL 6266162, at *15.

18

stockholder need not show a probability of success to meet the substantial-likelihood standard; the standard requires only a showing that "the claims have some merit."[45]

Plaintiff does not argue that the Committee Defendants acted in a self-interested manner or that they were beholden to an interested party. Rather, Plaintiff argues that the Committee Defendants failed to act in good faith when approving the TIDAL acquisition. Although a keen mind can rightly perceive a distinction between acting "not in good faith" and acting "in bad faith," Delaware courts have used the phrases interchangeably in this context, and this decision follows suit.[46]

Delaware courts have declined to offer an exhaustive definition of bad faith. "To engage in an effort to craft . . . 'a definitive and categorical definition of the universe of acts that would constitute bad faith' would be unwise."[47] The Delaware Supreme Court has described a non-exhaustive set of circumstances forming a failure to act in good faith:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his

---

[45] *Id.* at *16.

[46] *See, e.g.*, *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC*, 2009 WL 224904, at *5 (Del. Ch. Jan. 22, 2009) (noting that "in our corporate law, this court has firmly rejected the notion that the words 'not in good faith' mean something different than 'bad faith,' and has done so on sensible policy, logical, and linguistic grounds").

[47] *In re The Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 103 (Del. 2006); *see also*, *id.* at 64 (noting that the "duty to act in good faith is, up to this point relatively uncharted"); *McPadden v. Sidhu*, 964 A.2d 1262, 1263 & n.1 (Del. Ch. 2009) ("bad faith conduct has not yet been completely defined" (citations omitted)).

duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.[48]

Pleading a failure to act in good faith requires the plaintiff to "plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper."[49] That is, to allege a lack of good faith, a plaintiff must allege that the actor knew that he was acting "inconsistent with his fiduciary duties."[50] "Gross negligence, without more, is insufficient to get out from under an exculpated breach of the duty of care."[51]

Generally, this court is not in the business of second-guessing board decisions made by disinterested and independent directors. Of course, there are some business decisions that are so suspect that it is reasonably conceivable that the decision makers were not acting to advance the best interest of the corporation. Two cases relied on by the parties in briefing help delineate the boundaries of this principle—*Disney*, denying a motion to dismiss where the plaintiff adequately alleged that the board acted in bad faith, and *McElrath*, granting a motion to dismiss where the plaintiff failed to adequately allege that the board acted in bad faith.

In *Disney*, a stockholder sued Disney's departing CEO, Eisner, and its board for breach of fiduciary duty in connection with the hiring and firing of Eisner's longtime friend

---

[48] *Stone v. Ritter*, 911 A.2d 364, 369 (Del. 2006) (quoting *Disney*, 906 A.26 27 (Del. 2006)).

[49] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009).

[50] *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020).

[51] *Id.* at 991.

Ovitz as President. The narrative set out in the *Disney* complaint was quite stark. As alleged, Eisner "unilaterally" made the hiring decision.[52] The board did not receive any presentations on the terms of the employment contract, did not ask questions about the proposed agreement, received only a summary of the employment agreement's terms, approved the hire while the employment agreement was still a "work in progress," did not engage in further review once it had authorized the hire, and did not retain any outside experts to consult on the agreement.[53] Negotiation of the unresolved employment terms took place solely between Eisner, Ovitz, and their attorneys. The compensation committee followed up with meetings to receive updates on the negotiations but did not otherwise engage in the process. The final agreement differed vastly from the initial summary that the board had approved. And when Eisner terminated Ovitz a year later, the employment agreement allowed Ovitz to reap substantial exit benefits, which the board permitted without further investigation.

On these facts, then-Chancellor Chandler denied the defendants' motion to dismiss for failure to plead demand futility, holding that the plaintiff had adequately pled that the directors failed to act in good faith. The well-pled allegations portrayed more than mere negligent or grossly negligent conduct, and instead suggested "that the defendant directors *consciously and intentionally disregarded their responsibilities*, adopting a 'we don't care

---

[52] *Disney*, 825 A.2d at 287.

[53] *Id.*

21

about the risks' attitude concerning a material corporate decision."[54]  Put differently, the facts as alleged gave rise to the inference that the directors "*knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss."[55]  The Chancellor weighed the board's "ostrich-like" approach and concluded that the plaintiff had adequately alleged that "the defendant directors' conduct fell outside the protection of the business judgment rule,"[56] and that conclusion was sufficient to render demand futile under the second prong of *Aronson*.

Distinguishable allegations resulted in a different outcome in *McElrath*.[57]  There, a stockholder challenged Uber's acquisition of a self-driving car project from Google. Uber's CEO, Travis Kalanick, negotiated the acquisition.  Uber's diligence materials included a report from a computer forensic investigation firm finding that some of the target's employees had retained confidential information from Google following their departure.  When the misuse of confidential information was later revealed, Uber suffered financially and reputationally.  The plaintiff brought derivative claims against Kalanick and the directors who approved the transaction.  To plead bad faith as to a majority of the board, the plaintiff constructed a narrative that the board was on notice that Kalanick might ignore intellectual property issues because Kalanick's prior business had been sued for

---

[54] *Id.* at 289 (emphasis in original).

[55] *Id.* (emphasis in original).

[56] *Id.*

[57] *McElrath*, 224 A.3d at 995.

22

copyright violations, Uber had a practice of hiring employees from competitors to steal trade secrets, and the merger agreement contained an abnormal indemnification clause that prevented Uber from seeking indemnification from the target's employees for non-compete and infringement claims.

The defendants moved to dismiss the complaint for failure to plead demand futility, and Vice Chancellor Glasscock granted the motion. The Delaware Supreme Court affirmed on appeal, identifying a number of factors that made it unreasonable to infer that Uber's board acted in bad faith. The high court observed that "[b]y any reasonable measure, the Uber board of directors approved a flawed transaction," but that did not give rise to a "real threat of personal liability" sufficient to disqualify a majority of the board for Rule 23.1 purposes.[58] In reaching this conclusion, the court observed that the board did more than just rubberstamp the deal: they heard a presentation summarizing the transaction, reviewed the risk of litigation with Google, discussed due diligence, and asked questions. When the board asked questions about diligence and litigation risk, they received answers indicating that the risk was present, but not necessarily prevalent enough to kill the deal, and the board concluded that the diligence was "okay."[59] The high court rejected the appellant's appeal to *Disney* by noting important distinctions—unlike the board in *Disney*, the Uber directors heard a presentation from the CEO on the transaction, met to consider the acquisition, and enlisted the assistance of outside counsel and an investigative firm to

---

[58] *Id.* at 987.

[59] *Id.* at 993.

help with due diligence. The high court affirmed this court's dismissal based on the plaintiff's failure to show that the directors faced a substantial likelihood of liability.[60]

Here, as in *McErath*, it is clear that the TIDAL acquisition was a "flawed" business decision "[b]y any reasonable measure."[61] The question is whether, as in *Disney*, Plaintiff adequately alleged that the majority of the board acted in bad faith when approving it.

Plaintiff's counsel took an admirable stab at packaging the facts of this case into the mold of *Disney*. As Plaintiff tells it, Dorsey pulled some Eisner-level moves by pushing the deal forward singlehandedly, with the Transaction Committee playing an "ostrich-like" role.[62] Plaintiff alleges that Dorsey caused Block to submit a letter of intent to purchase TIDAL before the Transaction Committee was even formed. The Transaction Committee then allowed Dorsey to handle negotiations. After discussing the opportunity for only thirty-five minutes during their first meeting in September, the Transaction Committee encouraged Dorsey to move forward. In advance of its second meeting in October, management provided a report that showed just how dire TIDAL's market position looked.

To be sure, the Transaction Committee asked many questions throughout the process, and Plaintiff concedes this much. Plaintiff argues, however, that the court should not credit the Transaction Committee for asking questions given the answers it received.

---

[60] *Id.* at 995.

[61] *Id.* at 987.

[62] *Disney*, 907 A.2d at 765.

24

As Plaintiff sees it, the problem was not that the Transaction Committee failed to ask questions—it is that the answers did not seem to matter.

Before its October meeting, the Transaction Committee asked whether any other members of senior management supported the acquisition; in response, the committee learned that there were none, aside from Dorsey. The Transaction Committee asked whether the artist commitments, which formed the basis for at least half of management's valuation of TIDAL, were legally enforceable; in response, the committee learned that Block would have "no recourse" if the artists decided to walk away. The Transaction Committee asked for near- and long-term plans for integrating TIDAL into Block's business; in response, the committee learned that management had not created these plans and that this remained "one of the biggest risks."

After the October meeting, the Transaction Committee went dark for three months while Dorsey negotiated the purchase price. Ultimately, without any further meetings, the Transaction Committee approved the acquisition by unanimous written consent.

Although the facts emphasized by Plaintiff do not generate tremendous confidence in the Transaction Committee's process, they fall short of supporting an inference of bad faith. Effectively, Plaintiff asks the court to presume bad faith based on the merits of the deal alone. Plaintiff does not allege that the Transaction Committee lacked a business reason for wanting to acquire TIDAL—the presentation materials show management's

25

strategic goals for expanding Block into the music industry.[63]  Plaintiff does not attempt

allege that any of the Committee Defendants were in any way beholden to Dorsey.  Plaintiff

acknowledge that the Committee Defendants did not sit idly by while Dorsey presented.

They asked many appropriate questions before the October 20 meeting, and they asked

many appropriate follow-up questions in advance of the next meeting on January 22.  The

Transaction Committee were presented with over twenty single-spaced slides providing

management's detailed answers to each of these questions.  Over the course of negotiations,

and even inexplicably after the deal was publicly announced, the purchase price dropped

considerably.

On these facts, the Transaction Committee's actions more closely resemble those in

*McElrath* than *Disney*.  Plaintiff has alleged sufficient facts to make a reasonable person

question the business wisdom of the TIDAL acquisition, but Plaintiff has failed to plead

---

[63] The existence of a business rationale for the TIDAL acquisition distinguishes this case from a case recently dismissed by Vice Chancellor Cook, *Harris v. Junger*, C.A. No. 2022-0254-NAC (Del. Ch. Apr. 5, 2023) (TRANSCRIPT).  In *Harris*, a corporation's board approved a recapitalization that effectively granted the controller perpetual control, while receiving no consideration in return.  *Id.* at 33:20–34:1.  The defendant directors had struggled to provide a consistent rationale for the benefit to the corporation of this recapitalization over the course of two rounds of oral argument.  *Id.* at 29:9–30:10.  The Vice Chancellor concluded that the plaintiff adequately pled that the board acted in bad faith, noting that "as a sort of base line proposition, identifying benefits to the company accorded by a board-approved transaction should not be particularly difficult, let alone an enterprise years in the making."  *Id.* at 30:14–18.  This subjected the board to a substantial likelihood of liability and satisfied the demand futility test.  *Id.* at 33:3–10.  By contrast, here, documents incorporated by reference into the Complaint reflect that the Board identified the expansion into the music industry as a benefit to Block.

that the Committee Defendants acted in bad faith and thus faced a substantial likelihood of liability for that decision.

Plaintiff's allegations as to the remaining six non-Committee Defendant directors are even more attenuated. Plaintiff's only allegations as to those defendants are that they failed to meaningfully supervise the Transaction Committee's process. According to Plaintiff, the rest of the Board should have intervened to stop the TIDAL acquisition. Because Plaintiff has not adequately alleged that the Transaction Committee's approval of the TIDAL acquisition rose to the level of bad faith, it is difficult to imagine how the Board's lack of "supervision" of that process did so. Plaintiff's allegations as to the remaining directors fail.

## III.    CONCLUSION

Ultimately, the demand requirement is a manifestation of the business judgment rule, which exists in part to "free fiduciaries making risky business decisions in good faith from the worry that if those decisions do not pan out in the manner they had hoped, they will put their personal net worths at risk."[64] In this case, the demand requirement operates as intended. Because Plaintiff failed to adequately allege with particularity facts giving rise to a reasonable doubt that a majority of the Board was disinterested or lacked independence with respect to the TIDAL acquisition, Plaintiff failed to plead that demand was futile. Defendants' motion to dismiss pursuant to Rule 23.1 is granted.

---

[64] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011).